**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | | |
|---|---|---|
| THE FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION AS RECEIVER FOR | ) | |
| WAKULLA BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| WALTER C. DODSON, SCOTT W. GABY, | ) | JURY TRIAL DEMANDED |
| WILLIAM F. VERSIGA, GERALD D. | ) | |
| BRYANT, AND WALTER L. ROBERTS | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for Wakulla Bank ("FDIC-R"), for its Complaint states as follows:

**NATURE OF THE CASE**

1.      The FDIC-R brings this lawsuit as Receiver for Wakulla Bank of Crawfordville, Florida ("Wakulla" or "Bank"), to recover compensatory and other damages in excess of $14 million.  This lawsuit is against the following five former officers and directors of Wakulla ("Defendants"):   Walter C. Dodson ("Dodson"), Scott W. Gaby ("Gaby"), and William F. Versiga ("Versiga") ("Officer Defendants"), as well as Gerald D. Bryant ("Bryant") and Walter L. Roberts ("Roberts") ("Director Defendants").

2.      Defendants had a duty to engage in safe-and-sound lending practices.   Rather than act prudently, Defendants took unreasonable financial risks, violated internal policies and procedures when approving loan transactions, knowingly permitted poor underwriting in contravention of internal policies and reasonable industry standards, and ignored repeated

warnings about the risks associated with a high concentration in commercial real estate ("CRE") loans, including acquisition, development, and construction ("ADC") loans. The FDIC-R accordingly asserts claims for gross negligence and breach of fiduciary duty against all Defendants and additionally asserts claims against the Officer Defendants for ordinary negligence.

3.     Beginning in 2003 and continuing into 2009, each of the Defendants affirmatively approved certain poorly underwritten loans described below in their capacities as voting members of Wakulla's Loan Committee ("LC"). Defendants had personal knowledge of the dangers inherent in CRE and ADC loans as well as the necessity for vigorous underwriting of these loans, yet they engaged in and failed to put a halt to unsafe and unsound banking practices.

4.     Among other problems, Defendants did not implement a credit underwriting department until August 2009. Prior to that time, Defendants regularly approved loans and loan renewals based upon borrowers' and guarantors' incomplete, outdated, and unverified financial information on which Defendants required little or no credit analysis. Defendants coupled the insufficient credit underwriting with liberal lending practices, including granting interest-only and unsecured loans to borrowers and guarantors who had high-debt concentrations and poor credit histories.

5.     Defendants were aware of the increasing risk of these lending practices, but Defendants did not make appropriate changes, thus failing their primary fiduciary duty to ensure that operations were conducted in a safe-and-sound manner.

6.     Defendants' acts of negligence and gross negligence violated internal policies and procedures, banking regulations, and prudent and sound banking practices. For example, Defendants:

(a)      failed to obtain complete and recent borrower and guarantor financial information before approving loans and loan renewals;

(b)      failed to obtain complete and recent appraisals of collateral before approving loans and loan renewals;

(c)      failed to require cash flow and debt-to-income calculations for borrowers and guarantors before approving loans and loan renewals;

(d)      failed to appropriately limit individual borrower concentrations and adhere to loan-to value ("LTV") limits set forth in internal policies;

(e)      failed to adequately monitor construction transactions; and

(f)      failed to adequately monitor exposure to high CRE and ADC concentrations during a time of well-recognized national and local economic distress.

7.      Defendants' numerous, repeated, and obvious breaches caused substantial damages for which the FDIC-R now sues.  The FDIC-R seeks damages based on Defendants' actions and inactions in connection with 13 transactions described herein (collectively "the Subject Transactions").  In this lawsuit, the FDIC-R does not seek to collect upon outstanding loans but rather seeks to collect damages flowing from Defendants' negligence, gross negligence, and breaches of their fiduciary duty.

## THE PARTIES

8.      The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e).  Pursuant to 12 U.S.C. § 1821(c), the FDIC was appointed Receiver for Wakulla on October 1, 2010, following the Bank's closure by the Florida Office of Financial Regulation ("FOFR").  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded to all rights, titles, powers, and privileges of

the failed Bank and its depositors, account holders, other creditors, and stockholders, including those claims asserted herein against each of the Defendants.

9.      Defendant Walter C. Dodson was the Bank's President and Chief Executive Officer from the time he joined the Bank in 1974 until the Bank failed on October 1, 2010.  He was a director and LC member during the relevant time period.  Dodson is a citizen of Florida, residing in Crawfordville, Florida.

10.     Defendant Scott W. Gaby was Executive Vice President from 2000 until the Bank failed, as well as a director and LC member during the relevant time period.  Gaby is a citizen of Florida, residing in Crawfordville, Florida.

11.     Defendant William F. Versiga was employed by Wakulla from 1974 until the Bank failed.  He was Senior Vice President during the relevant time period, as well as a director and LC member.  Versiga is a citizen of Florida, residing in Crawfordville, Florida.

12.     Defendant Gerald D. Bryant was a director of the Bank from 1974 until the Bank failed.  He was Chairman of the Board of Directors and a LC member during the relevant time period.  Bryant is a citizen of Florida, residing in Tallahassee, Florida.

13.     Defendant Walter L. Roberts was a director of the Bank from 1987 until the Bank failed and a LC member during the relevant time period.  Roberts is a citizen of Florida, residing in Crawfordville, Florida.

## JURISDICTION AND VENUE

14.     This action arises under the laws of the United States of America, including 12 U.S.C. § 1821(d)(2) and (k) and 12 U.S.C. § 1819(b).  The Court has subject-matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1345.  Actions in which the FDIC-R is a party are

deemed to arise under federal law. 12 U.S.C. § 1811, *et seq.*  Under 12 U.S.C. § 1819, the FDIC-R has the power to sue in this court.

15.     The Court has personal jurisdiction over all of the Defendants who at all relevant times resided in Florida and conducted the Bank's business in Florida.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b) as all or substantially all of the events and/or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL ALLEGATIONS

### A.     Wakulla's CRE and ADC Transactions

17.     Wakulla was a state-chartered bank based in Crawfordville, Florida.  In 1974, Wakulla opened for business as Wakulla County State Bank, offering a range of commercial and consumer banking products and services.  The Bank changed its name to Wakulla Bank in 1994.

18.     Beginning in approximately 2002, Defendants pursued an aggressive growth strategy focused on high-risk CRE loans.  Between 2002 and 2006, the CRE portfolio grew rapidly, which by at least 2006, resulted in a dangerous over-concentration in CRE loans.  This over-concentration remained until the time of the Bank's closure.  Defendants knew or should have known of this risky over-concentration through the Bank's CRE Concentration Reports, which were part of the monthly reports presented to the Board of Directors, as well as quarterly Uniform Bank Performance Reports.

19.     Throughout this loan expansion period and thereafter, Defendants failed to follow sound risk management and credit underwriting practices.  As a result, adversely classified assets increased sharply from $1.6 million in mid-2006, to nearly $12 million in late 2007, and to over $75 million at the end of 2009.

20.     Defendants, as officers, directors, and/or members of the LC, were responsible for ensuring that there were adequate policies, procedures, and internal controls, that these policies, procedures, and internal controls were adhered to, and that approved loans were consistent with the policies, safe-and-sound banking practices, and prudent underwriting standards.

21.     Rather than following prudent loan underwriting practices, Defendants caused high-risk transactions to be made based on grossly deficient underwriting and questionable and outdated appraisals and financial information.   Additionally, Defendants permitted successive renewals of these transactions with no reduction in principal for the purpose of postponing problems with the transactions, in violation of internal policies.

**B.     The Loan Policy and Loan Approval Authorities**

22.     Defendants implemented specific written policies and procedures governing the approval, underwriting, monitoring, and renewal of loans (the "Loan Policy").   The Loan Policy was intended to limit risk exposure and ensure that the LC followed prudent banking practices in making loans.   Among other provisions, the Loan Policy required the following:

(a)     Loans were to be supported with documentation to allow a knowledgeable and prudent review of the loans by the LC.

(b)     A loan write-up was to be submitted prior to loan approval that described the purpose of the loan, the borrower's ability to repay, and the repayment structure.

(c)     Loan presentation forms were required to be completed and shared with the LC prior to loan approvals for all loans that exceeded the loan officers' lending authority, and these loan presentation forms required a LTV ratio calculation, a loan grade, borrower credit scores and a credit rating, the appraised value of the collateral, a summary of the financial documents submitted by the borrowers and guarantors, the total amount that the borrower already owed to

the Bank, a statement on whether the loan complied with the Loan Policy, any Loan Policy exceptions requested by the loan officer, and the borrower's total deposits with the Bank, among other information.

(d)     Renewals were to be treated as a new credit as to terms, loan limits, credit write ups, and appraisals of the collateral.

(e)     Renewals could not be used to avoid a systematic pay program, postpone a problem, or remove a delinquent loan from a past due report.

(f)     Interest was required to be current and the principal reduced before a loan was renewed.

(g)     Maximum LTV ratios were to be adhered to:  65 percent for raw land acquisition; 75 percent for land development; 80 percent for CRE construction loans; and 85 percent for CRE loans involving improved property.

(h)     Loan terms for CRE and multi-family residence construction loans were not to exceed nine months.

23.     Defendants violated the Loan Policy in making each and every loan described in this Complaint.

24.     Defendants also failed to ensure that the Loan Policy and other policies included critical provisions needed to avoid excessively risky lending practices.  In fact, prior to entering into the Subject Transactions, Defendants failed to implement at least the following:  (a) CRE concentration guidelines; (b) guidelines for cash flow analysis, debt-service coverage, and debt-to-income analysis on prospective loans; (c) income verification requirements; (d) limits on the number of loan renewals; (e) appraisal review guidelines; (f) individual borrower concentration limits; and (g) a credit underwriting department.

25.     Loan approval requirements depended on the proposed loan amount and type of collateral.   As President and CEO, Dodson had authority to approve secured loans up to $250,000 from at least October 2003 to July 2006 and up to $500,000 from July 2006 to at least February 2009.   Loans approved by Dodson were required to be presented at the next LC meeting for review and documentation purposes.  Executive Vice-President Gaby had individual authority to approve loans up to $75,000.   Senior Vice-President Versiga had individual authority to approve loans up to $50,000.  The LC had authority to approve all loans exceeding the individual Officer Defendants' lending authority.  Each of the Defendants was a member of the LC.

26.     Because of the dollar amount of the Subject Transactions, most were presented to the LC for approval.  As members of the LC, Defendants had access to all credit information about the Subject Transactions and could have requested additional information to determine whether the transactions should be approved or declined, yet routinely failed to do so.

27.     The Subject Transactions were approved by Defendants without ensuring that the transactions met the Loan Policy requirements and prudent standards for credit underwriting. Each of the Subject Transactions presented to the LC were approved without dissent despite obvious and material underwriting deficiencies that should have been readily apparent to Defendants upon a review of the information available to them regarding the transactions.

**C.     Defendants Approve the Subject Transactions Without Requiring Sufficient Credit Underwriting.**

28.     In 2005 and 2006, Defendants were warned by Bank employees and regulators that there was a need to establish a credit underwriting department and credit underwriting procedures to address the growing risk posed by the substantial increase in CRE loans.  Despite

these warnings, the declining real estate market, and the growing amount of adversely classified assets, Defendants failed to establish a credit underwriting department until August 2009.

29.     In reviewing the Subject Transactions, Defendants commonly received loan presentation forms prepared by loan officers.  The loan presentations typically included little, if any, credit analysis.  Cash flow statements and debt-to-income calculations were commonly excluded from the loan presentation.  The financial statements, tax returns, and appraisals that were made available to Defendants frequently were outdated.  Even when obtaining current financial information, Defendants did not require verification of borrowers' and guarantors' reported assets.  Despite the lack of adequate information, Defendants failed to request the information necessary to make prudent lending decisions.

30.     Many of the transactions were with borrowers who already had extremely high debt concentrations.  In fact, some of these borrowers had debt concentrations near or in excess of the legal lending limit.

**D.     Regulatory Warnings and Criticism**

31.     Regulators warned Defendants about certain imprudent lending practices.  For example, in or about July 2005, Defendants were advised by its regulators that "[a] documented analysis of the borrower's financial condition and repayment ability was lacking in many of the loan files that were reviewed.  The lack of documented cash flow analysis was also criticized at the last Corporation examination.  Cash flow guidelines should be incorporated into the Loan Policy…."  Three years later, in March 2008, Defendants still had not corrected the deficiencies, and regulators again criticized the absence of cash flow analysis and insufficient credit analysis for many of the Bank's transactions.

32.     In or about July 2005 and again in or about March 2008, regulators also criticized the quality of appraisal reviews, including the failure to review existing appraisals prior to loan renewals to check the continued validity of collateral value.  In the 2008 Report of Examination, regulators advised Defendants that the repeated use of stale appraisals in approving loan renewals violated the FDIC's appraisal regulations.  Despite receiving this criticism, Defendants waited until October 2009 to modify policies to address this regulatory violation.

33.     In or about July 2005 and March 2008, regulators also criticized the deficient management of CRE loans, concluding that Defendants had not "approved an overall CRE lending strategy regarding the level and nature of CRE exposures acceptable to the institution, including any specific commitments to particular borrowers or property types."

34.     On October 1, 2010, the FOFR closed the Bank, and the FDIC was appointed Receiver.

**E.     Defendants' Negligence and Gross Negligence In Connection With the Subject Transactions.**

35.     Defendants engaged in a pattern and practice of approving transactions that evidenced systematic deficiencies in the credit underwriting, approval, and monitoring process, that violated careful, reasonable, and prudent banking practices, and that violated or failed to comply with the Loan Policy.

36.     Approvals of the following transactions illustrate the types of failures, breaches, and violations of duty that Defendants committed, that caused damages, and that constitute breaches of their fiduciary duty, negligence, and gross negligence either separately or together as a pattern or practice.  (Certain Subject Transactions are described using the initials of individual borrowers and guarantors for privacy reasons.  The full names of these borrowers and guarantors will be provided once an appropriate protective order is in place.)

### 1. *One New Orleans Place, LLC*

37.     On or about March 3, 2005, Defendants Dodson, Gaby, Versiga, Bryant, and Roberts approved a $4.236 million interest-only ADC loan to a single-purpose entity, One New Orleans Place, LLC ("O.N.P."), to finance the construction of an office and condominium building.  The transaction was secured by the subject property.  The primary source of repayment was the sale of the office and condominium units.  Out of the original $4.236 million loan amount, $1.475 million subsequently was participated to another bank.  The Bank re-purchased the participation in April 2008.

38.     Approving this transaction, the renewals, and the re-purchase of the participated portion of the loan violated the Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects:   (a) insufficient analysis of the creditworthiness of the borrower and guarantors; (b) no cash flow analyses or debt-to-income calculations for certain guarantors; (c) the transaction exceeded the maximum loan term; (d) the LTV ratio was above the maximum limit; (e) the financial information relied upon to assess some of the guarantors' creditworthiness was stale because it was over one year old; and (f) reliance upon an outdated appraisal of the collateral for the renewals.  Defendants knew or should have known of these violations and the risks of approving the transactions, yet they approved the transactions in disregard of those risks.

39.     In late 2005, just a few months after Defendants approved the O.N.P. transaction, one of the guarantors debt concentrations at the Bank exceeded the legal lending limit as a result of an additional loan that was extended to him.  To remedy this violation, $1.475 million of the O.N.P. loan was participated to Farmers & Merchants Bank, specifically $1 million on January 24, 2006 and $475,000 on March 16, 2006.

40.     Problems with the O.N.P. transaction became evident as early as March 2006. Defendant Gaby reported construction delays due to structural engineering flaws and architectural problems.   As a result of the delays, the borrower sought a renewal of the transaction with a one-year term.  In the loan presentation for the renewal, dated March 29, 2006, Gaby noted that construction should be complete by June 1, 2006 and that the guarantors hoped to have sales contracts within 90 days of completion.

41.     In April 2007, Gaby recommended and Dodson, Versiga, Bryant, and Roberts approved the renewal of the transaction for another one-year term.  The transaction file did not provide any explanation as to why an additional extension was needed or what the sales prospects were for the subject property at that time.  Defendants did not seek an updated appraisal of the collateral prior to approving the transaction, despite the declining real estate market.

42.     On May 3, 2007, Dodson, Gaby, Versiga, Bryant, and Roberts approved the release of two of the four individual guarantors and their related entities without obtaining updated financial documentation from either the released or remaining guarantors to assess their ability to repay.  One of the two remaining guarantors had a debt concentration that was close to the legal lending limit.  The other guarantor had limited resources and other outstanding debt with the Bank.

43.      In December 2007, the borrower sold the commercial floor units of the subject property for approximately $90,000 less than originally anticipated.  By April 2008, none of the condominium units had sold.

44.     On April 3, 2008, Dodson, Gaby, Versiga, Bryant, and Roberts approved another renewal of the transaction and extended the term for an additional year.  In the presentation,

Gaby represented that repayment would be made by the sale of the subject property. However, Gaby provided no basis for this statement. A new appraisal still had not been obtained. In fact, Gaby specifically directed Bank employees to hold off on ordering a new appraisal. At that point, the most recent appraisal available was dated January 17, 2005, despite the fact that in May 2007 an appraiser informed the Bank that the "subject market" had seen a decline in values since the time of the 2005 appraisal.

45. On April 14, 2008, despite knowing about the borrower's difficulties in selling this property and the declining real estate values, Gaby and Dodson approved the re-purchase of the $1.475 million participated loan from Farmers & Merchants Bank. Gaby and Dodson approved this re-purchase without first obtaining an appraisal of the property or conducting a formal credit analysis and without submitting the proposed transaction for review and approval by the full LC, in contravention of the Loan Policy. Gaby renewed the note for a final time on September 12, 2008, extending the maturity date to September 12, 2009.

46. On September 2, 2009, one of the remaining guarantors informed Dodson, Gaby, and Versiga that he was over-leveraged and could not pay his debt any longer. On September 10, 2009, the other remaining guarantor gave notice that he could no longer continue to make interest payments on the transaction.

47. The borrower's last payment was made on August 22, 2008. The borrower subsequently defaulted. Defendants' tortious conduct in connection with this transaction has resulted in damages of at least $1.91 million.

### 2. *Wildwood Golf, LLC and Related Entities*

48. Between approximately October 2003 and December 2005, each of the Defendants approved at least four of five separate transactions made to purchase and operate a

golf course and construct a hotel adjacent to a country club in Medart, Florida. Specifically, Dodson, Gaby, Versiga, and Roberts approved a transaction on October 30, 2003 for $1.6 million. Dodson, Gaby, Versiga, Bryant, and Roberts approved two individual transactions on September 2, 2004 in the amounts of $3.2 million and $473,000, respectively. Dodson, Gaby, Versiga, and Bryan approved a transaction on September 29, 2005 in the amount of $800,000. On December 1, 2005, Dodson, Gaby, Versiga, Bryant, and Roberts approved a transaction in the amount of $259,000.

49.     On or about February 14, 2006, the above-described transactions were renewed and consolidated into a new CRE loan to a single-purpose entity, Wildwood Golf, LLC, ("Wildwood Golf") in the amount of $6.012 million. The underlying security was the subject property, namely, the golf course, golf course restaurant, and hotel, and the primary source of repayment was the property's business income.

50.     Approving the original five transactions, the consolidation and renewal in 2006, and subsequent renewals violated the Loan Policy, the Bank's appraisal policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects:   (a) insufficient analyses of the creditworthiness of the borrower and guarantors and the adequacy of the collateral; (b) the financial information relied upon to assess some of the guarantors' creditworthiness was stale because it was over one year old; (c) no cash flow analyses, debt service coverage analyses, or debt-to-income calculations performed prior to approving some of the transactions and renewals; (d) the appraisals for the collateral property were more than a year old at the time of some of the loan approvals; (e) in lieu of an appraisal for the golf course restaurant, Gaby prepared an unsupported in-house evaluation of the property; and (f) a high-debt concentration for certain guarantors with the debt concentration for one guarantor nearing

the legal lending limit.  Defendants knew or should have known of these violations and the risks of approving the transactions, yet they approved the transactions in disregard of those risks.

51.    On September 2, 2003, a Bank employee prepared a written analysis of the strength of the first proposed Wildwood Golf-related transaction, namely, a $1.6 million cash-out transaction for the purchase of a golf course.   After analyzing the golf course's financial statements, the Bank employee described the transaction as "a weak loan" and noted the following risks:  (a) "unfavorable trends in sales and profits;" (b) inadequate cash flow and debt service coverage; and (c) unrealistic company projections in view of historical trends.   The memorandum also noted numerous documentation inadequacies and the absence of an analysis related to the effect that another nearby golf course would have on Wildwood Golf's business. The Bank employee concluded the analysis by stating, "I don't think this is a good loan for our bank at this time."  Despite these warnings and unfavorable financials, Defendants approved the 2003 transaction and four subsequent transactions between September 2004 and December 2005 that increased the Wildwood Golf-related debt to over $6 million, making it one of the largest borrower relationships at Wakulla.  Defendants failed to properly discharge their duties in approving the transactions.

52.    In February 2006, Versiga signed a note that consolidated the five earlier transactions into one interest-only loan to Wildwood Golf without conducting or receiving any credit analysis and without obtaining a new loan presentation form, updated financial information, or an updated appraisal for the golf course.   At the time, the most current golf course appraisal that was available was dated October 2003.   For the value of the golf course restaurant, Versiga relied upon Gaby's unsupported in-house evaluation.  Versiga also failed to submit the new loan for review and approval by the full LC, in violation of the Loan Policy.

53.     In October 2007, Dodson, Gaby, Versiga, and Roberts approved the renewal of the consolidated loan for an additional one-year term without obtaining any new financial information to assess the guarantors' creditworthiness or the subject property's cash flow.  In doing so, these Defendants imprudently relied upon an outdated appraisal of the collateral.  Moreover, the loan presentation revealed that each of the four guarantors had a high-debt concentration, with one guarantor close to the legal lending limit.

54.     Despite the difficulties the borrower and guarantors were having in paying off the 2006 consolidated loan, Gaby, Versiga, Bryant, and Roberts approved a new transaction to one of the guarantors, J.B., and his wife in the amount of $285,000 on or about September 4, 2008 for the purpose of financing continued business operations for Wildwood Golf.  At the time of approval, Gaby already had facilitated the execution of the loan agreement and the disbursement of funds to J.B. and his wife, in violation of the Loan Policy.  The transaction was secured only by a second mortgage on professional office buildings, and the source of repayment was personal income.  Among other problems, these Defendants again failed to require sufficient credit underwriting on this transaction.  Even though the personal income of J.B. was the primary source for repayment of the loan, these Defendants did not require a cash flow statement or any financial analysis on J.B.'s ability to repay the loan.  These Defendants instead relied upon J.B.'s outdated tax returns showing an adjusted gross income of $34,434.  J.B.'s current tax returns reflected a negative adjusted gross income of $763,490.

55.     In November 2008, Dodson, Gaby, Versiga, Bryant, and Roberts approved the modification of the 2006 consolidated loan such that the borrower would cease all payments on the transaction for one year and then repay the transaction in full by September 17, 2009.  Gaby subsequently wrote a memorandum to a Bank employee in which he represented that the

modification agreement was not accurate.  Specifically, Gaby clarified that the loan would not be paid off in one year, the intent of the agreement was to give the borrower a one-year moratorium on payments, and regular monthly payments would restart on October 17, 2009.

56.     In October 2009, the borrower still was unable to adequately service the debt. Nevertheless, Defendants did not classify this loan as impaired or set aside any funds in the reserve allocation for this loan until in or about April 2010.

57.     Wildwood Golf's last payment on the consolidated transaction was made on October 31, 2008.  J.B.'s last payment on his September 2008 transaction was made on June 30, 2009.   Both of these borrowers subsequently defaulted.   Defendants' tortious conduct in connection with these transactions has resulted in damages of at least $2.39 million.

### *3.     Booth Holdings Booth Trust LLC*

58.     On or about February 24, 2005, Dodson, Gaby, Versiga, Bryant, and Roberts approved a $2.4 million interest-only CRE loan to Booth Holdings Booth Trust LLC ("Booth Holdings") for the purpose of cash-out refinancing of existing debt on an undeveloped parcel of land.   The security was the first mortgage on the subject property.   The primary source of repayment was the borrower's personal income and sale of the subject property.

59.     Approving this transaction and renewals of this transaction violated the Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects:  (a) insufficient analysis of the creditworthiness of the borrower and guarantor; (b) no debt-to-income analysis of the guarantor even though the expected repayment source was personal income; (c) the borrower's and guarantor's financial information for the renewals was stale since it was over one year old; (d) the LTV exceeded the maximum limit; (e) the loan exceeded the maximum loan term; (f) the guarantor had a high-debt concentration; and (g) no

rent rolls were required, even though the source of repayment changed in September 2005 to rental income. Defendants knew or should have known of these violations and the risks of approving the transactions, yet they approved the transactions in disregard of those risks.

60. In particular, Bank employees warned Dodson and Gaby on multiple occasions that they did not have sufficient information to perform an accurate credit analysis on this borrower, but Defendants still approved and renewed this transaction and others to the guarantor and his related entities.

61. Defendants renewed the transaction three times between September 2005 and March 2008 with little or no analysis of the borrower's and guarantor's creditworthiness or the proposed repayment sources. Additionally, the guarantor's debt concentration was increasing substantially due to Defendants' extension of additional loans to the guarantor and his related entities.

62. Defendants imprudently relied upon the same 2005 collateral appraisal for all of the renewals. By the time the property was finally reappraised in August 2009, the value of the property securing the loan had decreased to $720,500.

63. The borrower's last payment was made on January 8, 2008. The borrower subsequently defaulted. Defendants' tortious conduct in connection with this transaction has resulted in damages of at least $2.36 million.

### 4. L.E. and P.E.

64. Between August 1, 2006 and August 14, 2008, Defendants approved four new loans and two disbursements of additional funds on the loans to L.E. and P.E., which totaled over $3.78 million, for the purpose of financing their construction of various duplex residences and servicing the business debt associated with these real estate development projects. Specifically,

Gaby, Versiga, Bryant, and Roberts approved a transaction with L.E. and P.E. on August 10, 2006 in the amount of $150,000.  Gaby, Versiga, and Roberts approved a renewal of the August 10 transaction and the disbursement of additional funds in the amount of $100,000 on October 19, 2006.  Additionally, Dodson, Gaby, Versiga, Bryant, and Roberts approved the following transactions with L.E. and P.E.:  (a) a transaction on November 30, 2006 in the amount of $1.28 million; (b) a renewal with a disbursement of additional funds in the amount of $822,000 on August 9, 2007; and (c) a transaction on April 12, 2007 in the amount of $1.27 million.  Dodson also approved a transaction with L.E. and P.E. in August 2008 in the amount of $150,000.  The August 2006 transaction was initially an unsecured 60-day bridge loan that was to be repaid after the borrowers closed on a new mortgage.  In October 2006, the transaction was modified to a one-year term and secured by a life insurance policy.  The source of repayment was the sale of duplexes or other unspecified assets, but these assets were not utilized as collateral for the loan. The November 2006 and April 2007 transactions were secured by the subject duplexes, and the source of repayment was the sale of the duplexes.  The August 2008 transaction was secured by second and third mortgages on other real estate, and the primary source of repayment was real estate sales or a new loan.

65.    Approving these loans and the renewals of these loans violated the Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects:  (a) insufficient analysis of the creditworthiness of the borrowers; (b) no debt-to-income calculations for the borrowers; (c) borrowers had a poor credit history; (d) borrowers had a high debt concentration; (e) loans were renewed without a principal reduction; (f) the financial information relied upon to assess the borrowers' creditworthiness prior to some of the loan approvals was stale because it was over one year old; (g) loan approvals were granted prior to

receiving collateral appraisals; (h) reliance on outdated appraisals; (i) violation by Dodson of the Loan Policy regarding the approval and LC review process for one of the loans; and (j) insufficient monitoring of construction draws. Defendants knew or should have known of these violations and the risks of approving the transactions, yet they approved the transactions in disregard of those risks.

66.     In particular, by at least the fall of 2006, L.E. and P. E. had a poor credit history, including a credit report showing 59 late payments and a prior collection action, and loan debt already requiring payments of $19,300 per quarter. L.E. and P.E. had an adjusted gross income of approximately $71,000 in 2005, as reflected on their tax returns. Furthermore, the borrowers' self-reported net worth was tied mostly to illiquid real estate. Defendants nonetheless approved loans to the borrowers without first requiring a debt-to-income analysis or requiring verification of representations made by borrowers in their self-prepared financial statements.

67.     The borrowers' last payment on the August 2006 transaction was made on May 30, 2008. The borrowers' last payment on the November 2006 transaction was made on March 21, 2008. The borrowers' last payment on the April 2007 transaction was made on March 21, 2008. The borrowers' last payment on the August 2008 transaction was made on August 25, 2008. The borrowers subsequently defaulted on each of these loans. Defendants' tortious conduct in connection with these transactions has resulted in damages of at least $3.65 million.

### 5.      M.M. and T.M.

68.     On or about January 27, 2005, Dodson, Gaby, Versiga, Bryant, and Roberts approved a $1.080 million loan to M.M. and T.M. for the purpose of constructing the borrowers' primary residence. On May 31, 2007, Dodson, Versiga, Bryant, and Roberts renewed the loan and approved the disbursement of additional funds for the construction, totaling $360,000. On

May 1, 2008, Dodson, Gaby, Versiga, Bryant, and Roberts again renewed the loan and approved the disbursement of additional funds, totaling $213,000.  The security was a first mortgage on the subject property.  At the time of loan origination, the primary source of repayment was the sale of land owned by the borrowers or secondary market refinancing.  The expected source of repayment changed over time as the borrowers' financial condition continued to deteriorate.

69.     Approving the original transaction, the subsequent additional funds, and the renewals violated the Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects:  (a) insufficient analysis of the creditworthiness of the borrowers; (b) no debt-to-income analysis on the borrowers; (c) no cash flow analysis related to the borrowers' business; (d) the borrowers' tax returns at the time of some approvals were stale because they were over one year old; (e) the LTV ratio exceeded the maximum limit; (f) the transaction exceeded the maximum loan term; (g) the appraisals for the collateral property were more than a year old at the time of some of the transaction approvals; (h) lack of verification of expected sources of repayment; and (i) insufficient monitoring of construction draws. Defendants knew or should have known of these violations and the risks of approving the transactions, yet they approved the transactions in disregard of those risks.

70.     In particular, Defendants failed to require any verification or analysis of M.M.'s and T.M.'s expected sources of repayment, which changed from the sale of other land they owned, to a take out from another bank once construction was complete, to the sale of the subject property.  Additionally, the absence of inspection reports, draw requests, and photographs of the construction site in the loan file demonstrates that this construction project was not being monitored by the loan officer, yet Defendants continued to advance more funds for the project with no indication as to the status of the construction.

71.     The borrowers' last payment was made on April 30, 2008.   The borrowers subsequently defaulted.   Defendants' tortious conduct in connection with this transaction has resulted in damages of at least $1.69 million.

### 6.     Camelot Phase IV, Inc.

72.     On or about April 22, 2005, Dodson, Gaby, Versiga, Bryant, and Roberts approved an interest-only $1.6 million ADC loan to a single-purpose entity, Camelot Phase IV, Inc. ("Camelot"), for the purpose of purchasing and developing real estate lots in a neighborhood in Crawfordville, Florida.   The security was a first mortgage on the subject property.   The primary source of repayment was the sale of the subject property.

73.     Approving this loan and renewals of this loan violated the Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects:  (a) insufficient analysis of the creditworthiness of the borrower and guarantors; (b) no debt-to-income calculations for the guarantors; (c) no cash flow statement for the borrower; (d) no current tax returns for the borrower or guarantors, and outdated tax returns revealed substantial losses; (e) the borrower's and guarantors' financial information at the time of the 2007 loan renewal was stale because it was over one year old; (f) the loan exceeded the maximum loan term; (g) the appraisal for the collateral property at the time of the 2007 renewal was more than a year old; (h) guarantors had poor credit histories; and (i) insufficient monitoring of construction draws.   Defendants knew or should have known of these violations and the risks of approving the transactions, yet they approved the transactions in disregard of those risks.

74.     In particular, Defendants approved this transaction even though the guarantors had troubled credit histories, below average credit scores, and an inability to service the debt from their personal finances.   Defendants granted Camelot an interest-only loan and established a

reserve from the loan proceeds to cover interest payments.  Defendants subsequently failed to adequately monitor the project.  By December 2008, the project that was supposed to have been completed in December 2005 still was not complete, and the interest reserve had been depleted.

75.     The borrower's last payment was made on April 29, 2008.  The borrower subsequently defaulted.  Defendants' tortious conduct in connection with this transaction has resulted in damages of at least $650,000.

### 7.     *Tallahassee Real Estate Holdings, LLC and 21st Century Building Company, LLC*

76.     On or about May 10, 2006, Dodson, Gaby, Versiga, and Bryant approved a $1 million loan to Tallahassee Real Estate Holdings, LLC for the purpose of completing the construction of residences for resale.  Although the primary source of repayment was the sale of the residences being constructed, the transaction was not secured by this property or any other collateral.  On June 14, 2007, Dodson, Versiga, Bryant, and Roberts renewed the loan and the loan agreement was modified to reflect 21st Century Building Company, LLC ("21st Century") as the borrower.  Gaby, Versiga, Bryant, and Roberts renewed this unsecured transaction a second time on May 22, 2008.

77.     Approving this transaction and the renewals violated the Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects:  (a) insufficient analysis of the creditworthiness of the borrower and guarantors; (b) no cash flow or debt-to-income analyses; (c) the guarantors' financial information was stale because it was over one year old; (d) no appraisal of the subject property even though it was the primary source of repayment; (e) history of late payments for some of the guarantors; (f) the transaction was not secured by the subject property or any other collateral; and (g) insufficient monitoring of

construction draws.  Defendants knew or should have known of these violations and the risks of approving the transactions, yet they approved the transactions in disregard of those risks.

78.     In particular, Dodson, Gaby, Versiga, and Bryant approved the transaction without requiring that the subject property be used as collateral for the transaction.  By June 2007, the property securing the transaction had been sold, but the borrower was not required to use the sales proceeds to pay its debt.  The guarantors represented that cost overruns and engineering problems reduced the profit that they originally expected from the sale of the subject property, and as a result, there were insufficient funds to pay the debt.  The guarantors further represented that they had other properties that could generate income and profit.  Based on this representation, Defendants renewed the loan in 2007 and again in 2008 without obtaining any collateral to secure the transaction.

79.     The borrower's last payment was made on December 29, 2008.  The borrower subsequently defaulted.  Defendants' tortious conduct in connection with this transaction has resulted in damages of at least $940,000.

### 8.     *T.K.*

80.     On or about August 1, 2006, Dodson, Gaby, Versiga, Bryant, and Roberts approved an $850,000 cash-out CRE loan to T.K. for the purpose of business debt consolidation, including the debt from the purchase of a business property.  The security was a second mortgage on the business property.  The primary source of repayment was rental income from the subject property and the personal income of the borrower.

81.     Approving this transaction violated the Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects:  (a) insufficient analysis of the creditworthiness of the borrower; (b) no global cash flow statement for all of the

borrowers' businesses; (c) no complete debt-to-income analysis even though personal income was listed as a source of loan repayment; (d) borrower had history of late payments; (e) borrower had a high-debt concentration; (f) no rent rolls were collected; and (g) Defendant Gaby decreased the loan's interest rate in 2008 without LC approval. Defendants knew or should have known of these violations and the risks of approving the transaction, yet they approved the transaction in disregard of those risks.

82. In particular, Defendants approved this transaction without requiring rent rolls, even though rental income was the primary source of repayment and over half of T.K.'s income came from real estate rentals. T.K. had a self-reported annual income of $172,000, and after this transaction was approved, a total debt with the Bank of over $2.25 million.

83. The borrower's last payment was made on May 14, 2008. The borrower subsequently defaulted. Defendants' tortious conduct in connection with this transaction has resulted in damages of at least $800,000.

### 9. C.S.

84. On or about February 26, 2009, Dodson, Gaby, Versiga, Bryant, and Roberts approved a $288,000 loan to C.S. for the purpose of providing operating expenses for C.S.' real estate business. The security was a second mortgage on a property and a life insurance policy. The primary source of repayment was a possible tax refund.

85. Approving this transaction and the renewals violated the Loan Policy, the Bank's appraisal policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects: (a) insufficient analysis of the creditworthiness of the borrower; (b) unreliable source of loan repayment; (c) failure to perfect the Bank's interest in the collateral; (d)

no written appraisal of the collateral prior to loan approval; (e) borrower resided outside the Bank's primary trade area; (f) the LTV ratio exceeded the maximum limit; (g) the borrower had a high-debt concentration; (h) the borrower had a troubled payment history at the time of loan renewals; and (i) renewals of the loan were granted without reduction in principal. Defendants knew or should have known of these violations and the risks of approving the transactions, yet they approved the transactions in disregard of those risks.

86.     In particular, Defendants knew that the borrower's 2007 tax returns showed a negative adjusted gross income of $585,000 and that the borrower's real estate business was struggling. Defendants relied on a possible tax refund as the source of repayment and failed to require a written appraisal of the collateral prior to loan approval.

87.     By January 2010, problems were discovered with the loan collateral and expected source of repayment. A note in the file from Gaby indicated that the borrower did not expect to receive the tax refund in the near future. Furthermore, it was discovered that the borrower's life insurance policy had never been assigned to the Bank and had expired. Additionally, the deed of trust on the collateral property had not been extended at the time of the first loan renewal and had matured. Defendants subsequently renewed the loan and modified the terms such that it was an unsecured loan.

88.     The borrower's last payment was made on June 5, 2009. The borrower subsequently defaulted. Defendants' tortious conduct in connection with this transaction has resulted in damages of at least $120,000.

## CLAIMS FOR RELIEF

### COUNT I

### Negligence Claim Against Officer Defendants

**(Defendants Dodson, Gaby, and Versiga)**

89.     The FDIC-R repeats and makes a part hereof each and every allegation contained in Paragraphs 1 through 88 of this Complaint.

90.     The Officer Defendants' actions and omissions constitute negligence under Florida law.  Specifically, and as detailed above, these Defendants acted without exercising the degree of diligence, care, skill, and good faith that ordinarily prudent persons in like positions would exercise under similar circumstances in the evaluation, approval, and administration of the Subject Transactions.

91.     The Officer Defendants' acts of negligence include, but are not limited to, the following acts and omissions:

(a)     failing to conduct proper due diligence on the Subject Transactions and the risks that approving such transactions posed;

(b)     violating the Loan Policy when approving the Subject Transactions;

(c)     failing to ensure that the Subject Transactions were underwritten in a safe-and-sound manner;

(d)     failing to ensure that the Subject Transactions were made with creditworthy borrowers and were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss;

(e)     failing to ensure that the Subject Transactions did not violate applicable banking laws and regulations;

(f)     failing to ensure that the Subject Transactions did not create unsafe and unsound concentrations of credit;

(g)     ignoring regulators' warnings about CRE concentrations and inadequate credit underwriting practices;

(h)     failing to exercise independent judgment in the performance of their duties; and

(i)     failing to perform faithfully and diligently their duties as members of the Loan Committee.

92.     The Officer Defendants' negligent acts, omissions, and tortious conduct have directly and proximately caused substantial damage in an amount to be proven at trial.

## COUNT II

### Gross Negligence Claim Against All Defendants
### (Defendants Dodson, Gaby, Versiga, Bryant, and Roberts)

93.     The FDIC-R repeats and makes a part hereof each and every allegation contained in Paragraphs 1 through 88 of this Complaint.

94.     Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act holds officers and directors of financial institutions personally liable for damages caused by their "gross negligence," as defined by applicable state law.

95.     Defendants' actions and omissions constitute gross negligence under Florida law. Specifically, and as detailed above, Defendants acted without exercising slight care and knew or should have known that their systematic and repeated disregard of the Loan Policy, underwriting guidelines, and reasonably prudent banking practices in approving the Subject Transactions would likely result in injury to the Bank, its shareholders, account holders, and depositors.

96.     Defendants' acts of gross negligence include, but are not limited to, the following acts and omissions:

(a)     failing to conduct proper due diligence on the Subject Transactions and the risks such transactions posed;

(b)     violating the Loan Policy when approving the Subject Transactions;

(c)     failing to ensure that the Subject Transactions were underwritten in a safe-and-sound manner;

(d)     failing to ensure that the Subject Transactions were made with creditworthy borrowers and were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss;

(e)     failing to ensure that the Subject Transactions did not violate applicable banking laws and regulations;

(f)     failing to ensure that the Subject Transactions did not create unsafe and unsound concentrations of credit;

(g)     ignoring regulators' warnings about CRE concentrations and inadequate credit underwriting practices;

(h)     failing to exercise independent judgment in the performance of their duties; and

(i)     failing to perform faithfully and diligently their duties as members of the Loan Committee.

97.     Defendants' grossly negligent acts, omissions, and tortious conduct have directly and proximately caused substantial damage in an amount to be proven at trial.

## COUNT III

### Breach of Fiduciary Duty Claim Against All Defendants
### (Defendants Dodson, Gaby, Versiga, Bryant, and Roberts)

98.     The FDIC-R repeats and makes a part hereof each and every allegation contained in Paragraphs 1 through 88 of this Complaint.

99.     As officers and directors of Wakulla, Defendants individually owed a fiduciary duty of loyalty to the Bank, its shareholders, account holders, and depositors.

100.   Defendants breached their fiduciary duty of loyalty by acting in bad faith and failing to act in the best interests of the Bank, its shareholders, account holders, and depositors.

101.   Defendants' breaches of their fiduciary duty of loyalty include, but are not limited to, the following acts and omissions:

a)   failing to conduct proper due diligence on the Subject Transactions and the risks such transactions posed before approving them;

(b)   violating the Loan Policy when approving the Subject Transactions;

(c)   failing to ensure that the Subject Transactions were underwritten in a safe-and-sound manner;

(d)   failing to ensure that the Subject Transactions were with creditworthy borrowers and were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss;

(e)   failing to ensure that the Subject Transactions did not violate applicable banking laws and regulations;

(f)   failing to ensure that the Subject Transactions did not create unsafe and unsound concentrations of credit;

(g)   ignoring regulators' warnings about the CRE concentrations and inadequate credit underwriting practices;

(h)   failing to exercise independent judgment in the performance of their duties; and

(i)   failing to perform faithfully and diligently their duties as members of the Loan Committee.

102.    Defendants' breaches of their fiduciary duty have directly and proximately caused substantial damage in an amount to be proven at trial for which Defendants are jointly and severally liable.

## REQUEST FOR RELIEF

103.    Pursuant to Federal Rule of Civil Procedure 38, the FDIC-R demands a trial by jury on all claims.

WHEREFORE, as a result of the acts and omissions of Defendants set forth above, the FDIC-R requests the entry of judgment against Defendants as follows:

(a)     an award of damages in an amount to be proven at trial;

(b)     an award of prejudgment interest on such damages;

(c)     an award of costs and other expenses recoverable in connection with this proceeding; and

(d)     such other relief as this Court deems just and proper.

Dated this 31st day of July, 2013

s/Kenneth R. Hart
Kenneth R. Hart, Fla. Bar No. 192580
David J. Weiss, Fla. Bar No. 073963
AUSLEY MCMULLEN
123 S. Calhoun Street
P.O. Box 391
Tallahassee, Florida 3202
(850) 425-5462
(850) 222-7560 (facsimile)
khart@ausley.com

Antony S. Burt
Valarie Hays
Calida A. Motley
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, Illinois 60606
(312) 258-5500
(312) 258-5700 (facsimile)
aburt@schiffhardin.com
vhays@schiffhardin.com
cmotley@schiffhardin.com
*(Pro Hac Vice* to be filed)

*Counsel for the Federal Deposit Insurance Corporation, as Receiver for Wakulla Bank, Plaintiff*